# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| FRANK SCACCIA and | ) | |
| THERESA NEUBAUER | ) | Case No. 11 CR 0533 |
| | ) | |

## MEMORANDUM OPINION & ORDER

Frank Scaccia and Theresa Neubauer have each been charged with one count of knowingly and willfully engaging in a false-statement scheme, in violation of 18 U.S.C. §§ 1001(a)(1) and (2), and 22 counts of knowingly and willfully making false statements, in violation of 18 U.S.C. §§ 1001(a)(2) and (2). Before the court are three pre-trial motions: (1) the defendants' joint motion to dismiss the indictment for lack of federal jurisdiction; (2) Scaccia's motion to suppress statements made to agents of the United States Environmental Protection Agency ("U.S. EPA") and request for an evidentiary hearing; and (3) Neubauer's motion to suppress statements made to agents of the U.S. EPA and request for an evidentiary hearing.

### I. BACKGROUND

The Safe Drinking Water Act of 1974 ("SDWA"), 42 U.S.C §§ 300f to 300j-26, is a federally mandated and state-administered regulatory scheme for the protection of public drinking water. Pursuant to 42 U.S.C. § 300g-2, the U.S. EPA has granted primary enforcement responsibility for public water systems in the State of Illinois to the

Illinois Environmental Protection Agency ("Illinois EPA"). The state is required to adopt "drinking water regulations that are no less stringent than the national primary drinking water regulations." *Id.* § 300g-2(a). The U.S. EPA reviews and provides funding to the state regulatory program. *See* 40 C.F.R. § 142. When a public water system is out of compliance with federal requirements, the U.S. EPA provides "advice and technical assistance" to the state and has the authority to commence a civil action if the state fails to bring appropriate enforcement action within 30 days. § 300g-3(a)(1)(A), (B).

According to the indictment, between 1987 and 2008, Scaccia was the certified water operator for the Village of Crestwood, Illinois ("Crestwood"), and Neubauer was Crestwood's Water Department Clerk and Water Department Supervisor. Count 1 of the indictment alleges that "the defendants engaged in a multi-year scheme to conceal the fact that [Crestwood] was supplementing its primary drinking supply (Lake Michigan water) with water drawn from an underground well" ("Well #1").

In concealing the use of the well, Crestwood's community water system violated several U.S. and Illinois EPA regulations, two of which are relevant to the indictment. First, public water systems must to disclose to their customers in an annual Consumer Confidence Report ("CCR") the sources of water used for public drinking water supplies. Crestwood failed to disclose the use of Well #1. The defendants were responsible for preparing and filing the CCRs and issuing them to customers. Counts 2-4 of the indictment allege that the defendants falsely stated in the CCRs issued for 2005-2007 that Crestwood's drinking water came solely from Lake Michigan.

Crestwood officials were also required to submit to the Illinois EPA a Monthly Operation and Chemical Analysis Report ("MOR") that disclosed information about the

operation of Well #1. Scaccia was responsible for obtaining the raw data used to complete the MORs, and Neubauer was responsible for preparing the MORs and submitting them to the Illinois EPA. Counts 5-23 of the indictment allege that the defendants falsely reported in MORs filed between 2006 and 2008 that Well #1 was in standby status and was not used as a source of drinking water.

## II. ANALYSIS

**A. Defendants' Joint Motion to Dismiss the Indictment**

The defendants move this court, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), to dismiss the indictment on the basis that the government cannot establish the jurisdictional element required under 18 U.S.C. § 1001(a), which applies to schemes to conceal material facts and to false statements made "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States."

The defendants argue that the federal government lacks authority over the alleged false statements concerning Crestwood's drinking-water supply. The statements were submitted not to the U.S. EPA, but to the Illinois EPA, which was granted primary enforcement authority over public water systems in Illinois by the federal agency. Given this balance between state and federal authority, defendants argue, there is no basis for federal jurisdiction over the alleged violations. The government responds that the U.S. EPA retains substantial oversight over the state agency to ensure compliance with federal regulations. The strong federal presence in the state public drinking-water program indicates that false statements made to the Illinois EPA relate to the functions of the federal agency, and that the federal agency retains authority over those statements.

Jurisdiction over false statements under § 1001(a) extends wherever the federal government "has the power to exercise authority." *United States v. Rodgers*, 466 U.S. 475, 479 (1984). Jurisdiction is broadly construed. *Bryson v. United States*, 396 U.S. 64, 70 (1969). The false statements need not have been made to a federal agent. *United States v. King*, 660 F.3d 1071, 1081 (9th Cir. 2011). Rather, there must be "a 'direct relationship' between the authorized functions of [a federal] agency and the false statement." *Id.* at 1081 (quoting *United States v. Facchini*, 874 F.2d 638, 641 (9th Cir. 1989)).

Other circuits have held that the grant of primary authority by the U.S. EPA to a state agency to enforce public-water regulations does not strip the agency of federal jurisdiction under § 1001(a).[1] In *United States v. Wright*, a defendant submitted false water-quality reports to the Oklahoma State Department of Health. 988 F.2d 1036, 1036-37 (10th Cir. 1993). The Tenth Circuit held that the false statements fell within the jurisdiction of the EPA even though Oklahoma had been granted primary enforcement responsibility over drinking-water standards. That court explained, "A grant of primary authority is not a grant of exclusive authority." *Id.* at 1038. The U.S. EPA retained the authority to enforce the regulations and was "actively involved in assuring state compliance" by auditing and reviewing the state program. *Id.* at 1039. Moreover, the state agency used federal funds, and the U.S. EPA retained the authority to see that those funds were properly spent. *Id.*

---

[1] Defendants rely on a Ninth Circuit case, *Facchini*, holding that no federal jurisdiction existed under § 1001 over false statements made to a state unemployment insurance program. 874 F.2d at 642. The state program paid benefits using exclusively state funds, and the Department of Labor monitored the program's administrative structure, but did not "monitor the actual operation of the state program." *Id.* This court finds the case unpersuasive, given the great difference between the federal interest in regulating drinking-water standards—a key function of the U.S. EPA—and the federal interest in monitoring a state unemployment-insurance program.

The Sixth Circuit took the same approach in *United States v. White*, 270 F.3d 356 (6th Cir. 2001), involving false statements made in reports submitted to the Kentucky Division of Water. Although Kentucky was granted primary enforcement authority over the state's drinking water, the U.S. EPA retained "a federal interest in what reasonably must be considered an official function of the EPA, ensuring safe drinking water." *Id*. at 364. The court noted that the Division received federal funding to administer its public-water programs and that the U.S. EPA could commence a civil action should the state fail to enforce water regulations properly. *Id*. at 363.

Most recently, in *King*, the Ninth Circuit held that the U.S. EPA had jurisdiction over false statements made by a defendant to an Idaho agricultural inspector. 660 F.3d at 1082. The matter fell within federal authority even though Idaho was charged under the SDWA, 42 U.S.C. § 300h, with enforcing a program regulating injections into drinking water aquifers. *Id.* at 1081.

This court find these cases persuasive and concludes that the false statements about Well #1 allegedly made by the defendants fall within the U.S. EPA's authority.

The analysis does not end there, however. The defendants argue that, even if the false statements made on the CCRs fall within federal jurisdiction, the statements contained in the MORs do not. Unlike the CCRs, which are required by U.S. EPA regulations, no federal regulations require the submission of the MORs. The MOR reporting requirement was created by the state. The government responds that this court should focus not on the origin of the reporting requirement, but on the fact that, in submitting the MORs, the defendants lied to the Illinois EPA. The lie was related to the

5

federal interest in monitoring water quality and therefore falls within federal jurisdiction under § 1001.

The government has the better argument here. Under *King*, false statements need not have been made to a federal agent to fall within federal jurisdiction. 660 F.3d at 1081. Instead, jurisdiction exists where there is "a 'direct relationship' between the authorized functions of an agency and the false statement." *Id.* With respect to the statements in the MORs, this court finds there is a sufficient nexus between the alleged false statements in the monthly reports about drinking-water sources submitted to the Illinois EPA and the function of the U.S. EPA to regulate the public drinking-water supply to bring the statements within the jurisdiction of the federal agency.

**B. Scaccia's Motion to Suppress and Request for an Evidentiary Hearing**

Scaccia moves to suppress statements made to agents of the U.S. EPA on and after April 21, 2009. Scaccia made oral statements to Special Agents Christopher Pullos and Matthew Siler of the U.S. EPA's Criminal Investigation Division during visits by the agents to his home on April 21, 2009, April 23, 2009, and April 29, 2009. He made additional statements by telephone on April 23, 2009, and April 30, 2009. He also made a handwritten statement on April 23, 2009.

The burden is on the government to prove by a preponderance of the evidence the voluntariness of a defendant's statements. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Villalpando*, 588 F.3d 1124, 1128-29 (7th Cir. 2009). "An incriminating statement is voluntary if it is 'the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *Villalpando*, 588 F.3d at 1128 (quoting

*United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). The Seventh Circuit has explained that "a false promise of leniency may render a statement involuntary," but that "tactics short of the false promise are usually permissible." *Id*. The promise made must have been "materially false." *Id*. As the Seventh Circuit noted in *Villalpando*, when evaluating whether an allegedly false promise makes a statement involuntary, "the devil is in the details." *Id*. at 1129 (holding that none of detective's statements "represented a solid offer of leniency in return solely for [defendant's] admission to cocaine possession"). For example, the police may not extract a confession by falsely promising to set a defendant free. *United States v. Rutledge*, 900 F.2d 1127, 1129-30 (7th Cir. 1990). But tactics short of "an outright and material lie" are permissible; the police may "pressure and cajole, conceal material facts, and actively mislead" a defendant without rendering statements involuntary. *Hadley v. Williams*, 368 F.3d 747, 749 (7th Cir. 2004) (stating that "the law . . . draws the line at outright fraud").

When a defendant requests an evidentiary hearing on a motion to suppress, this court is required to grant the hearing only when a substantial claim is presented and disputed issues of material fact will affect the outcome of the motion. *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). The defendant must identify a disputed factual issue and demonstrate its materiality, and the defendant's allegations must be "definite, specific, non-conjectural and detailed." *Id*. (quoting *United States v. McGaughy*, 485 F.3d 969, 969 (7th Cir. 2011)).

Scaccia argues that, because he was promised that the information he provided to the agents would be "kept confidential," his confession was given involuntarily and is inadmissible. His motion alleges the following facts:

> Prior to Scaccia having made any statements to the agents, he was told that any information he provided to the agents would be kept confidential. This promise is, in fact, acknowledged by the agents, as the opening paragraph of their report of April 21, 2012 [sic] (the report of the first statement), states that "Scaccia was advised that the information he provided would be kept confidential to the extent allowed by law."

(Scaccia Mot. Supp.¶ 6, ECF No. 42.) Scaccia adds in his reply brief that he "informed the agents that he wanted whistle blower protection" and that the promise of confidentiality was made after that request. (Scaccia Reply Br. 5, ECF No. 52).[2]

The government responds that the promise of confidentiality was offered only to assure Scaccia that he would not be revealed to his employers as a source in the investigation, and that Scaccia does not allege that any promise of immunity from criminal prosecution was made by the agents. It further argues that, because Scaccia's motion to suppress is premised on a single sentence in the agents' report—that the information "would be kept confidential to the extent allowed by law"—it lacks the type of specific and detailed facts required to justify suppression, such as, for example, the specific words on which Scaccia claims to have relied.

Before granting an evidentiary hearing on a motion to suppress, this court must be able "to discern the disputed factual issue" that would determine the outcome of the motion. *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004). Scaccia's motion alleges one fact: that the EPA agents told him his statements would be "kept confidential." To determine whether this fact is material—whether it affects the outcome of the motion—this court assumes that it is true. If Scaccia's claim fails nonetheless, the fact is not material to the resolution of the suppression motion, and no evidentiary hearing is required.

---

[2] The court notes that the whistleblower argument could be considered waived because it was raised for the first time in Scaccia's reply brief. *See Judge v. Quinn*, 612 F.3d 537, 542 (7th Cir. 2010). Even so, the court will evaluate whether the alleged facts would entitle Scaccia to an evidentiary hearing.

8

Assuming that the agents told Scaccia his statements would be kept confidential, this court finds no disputed issue of material fact. Scaccia's assertion does not preclude the government's account of what happened. Scaccia does not claim that the agents promised him that no charges would be brought against him if he cooperated or that the agents affirmatively told him the statements would not be used against him in a criminal prosecution. He also admits that "the agents did not specifically indicate that [he] would be given whistle blower protection." (Scaccia Reply Br. 5.) Telling a source that his statements will be kept confidential is not equivalent to telling him that the statements would not be used against him at trial or in pursuit of a warrant, particularly when the promise is tempered with the words "to the extent allowed by law." The promise of confidentiality was more likely to mean that the agents would not disclose Scaccia's statements to the media or to other sources in the investigation. The agents could have kept the information confidential in this respect while nonetheless using it as the basis for criminal charges. Moreover, the officers were not required to tell Scaccia that he was personally under investigation. *See, e.g.*, *United States v. Boskic*, 545 F.3d 69, 78–80 (1st Cir. 2008) (rejecting defendant's argument that officers intentionally deceived him into believing he was not a target, because "[a]lthough the fact that the agents allowed him to believe that he was not under investigation may have made him less guarded and self-protective, that deception alone did not make his statements involuntary").

This court finds there is no disputed factual issue requiring an evidentiary hearing on Scaccia's motion to suppress. The motion to suppress is denied.

**C. Neubauer's Motion to Suppress and Request for an Evidentiary Hearing**

Neubauer moves this court to suppress statements made to agents of the U.S. EPA on April 29, 2009, arguing that the statements resulted from an unlawful custodial interrogation. She contends that the agents violated her Fifth-Amendment rights by detaining and interrogating her without advising her of her right against self-incrimination, as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). She further argues that the statements elicited from her were involuntary.

*Miranda* requires that the government inform a suspect of the privilege against self-incrimination when the suspect is both in custody and subjected to interrogation. *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) (citing *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984)). Even if a person has not been arrested, she is considered to be "in custody" if she is subjected "to a restraint on . . . her freedom of movement of the degree associated with a formal arrest." *Id*. (citing *J.D.B. v. North Carolina*, __ U.S. __, 131 S. Ct. 2394, 2402 (2011)). The Seventh Circuit has characterized the question as "whether the person is deprived of his or her freedom of action in any significant way." *Id.* The inquiry is objective: whether, under the circumstances, "a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B.*, 131 S. Ct. at 2402. The Seventh Circuit has identified a non-exhaustive list of indicia of custody, including whether: (1) the encounter occurred in public; (2) the suspect consented to the interview; (3) the officers informed the suspect that she was not under arrest; (4) the suspect was "moved to another area;" (5) "there was a threatening presence of several officers and a display of weapons or physical force;" (6) "the officers deprived the suspect of documents needed to depart;"

and (7) "the officers' tone of voice." *Ambrose*, 668 F.3d at 956 (quoting *United States v. Barker*, 467 F.3d 625, 629 (7th Cir. 2006)).

Neubauer alleges that she was interrogated while serving as the Chief of Police for Crestwood Village. On April 29, 2009, agents from the U.S. EPA, along with Illinois EPA agents and Illinois State Police officers, came to Crestwood Village offices to execute a search warrant. The agents were "fully armed" and "wore raid jackets, badges, and other patches indicating that [they] were part of a Criminal Investigation Division." (Def. Neubauer's Mot. Supp. 4, ECF No. 44.) Two agents, Matthew Siler and William Oros, came to the lobby of the Crestwood Police Department and asked to speak to "the Chief." Neubauer was informed "that Federal Agents were 'all over the place.'" (Id.) According to Neubauer, she entered the lobby and was buzzed into a corridor leading her private office. The agents followed her down the corridor and into her office. After entering they closed the doors to the office, which automatically locked. (Id.) Neubauer sat at her desk, and the agents sat opposite her, between Neubaeur and the office door. According to Neubauer, the agents did not tell her that she could leave or that they would depart if she wished. (Id. at 5.)

Neubauer further states that the agents told her that Village employees were being interviewed and that another employee had thrown her "under the bus." (Id.) Warrants were being served on the Village Hall and the Public Works Department, and the investigative team planned to seized documents and mirror computers. (Id.) The agents "told Neubauer that April 29, 2009 was going to be a 'very important day' for her, and that the way that she answered questions would determine if and how the case moved

11

forward against her." They told her, "we arrest governors, do you think we have a problem arresting a police chief?" (Id. at 6.)

As discussed with respect to Scaccia's motion, above, this court will grant an evidentiary hearing only if there are disputed factual issues that would determine the outcome of Neubauer's motion. Accordingly, we take the above facts alleged by Neubauer as true. As the inquiry is objective, however, we do not consider Neubauer's emotional state or her subjective perception of the circumstances—that is, whether she "felt detained" or believed "she could refuse to answer questions." (See Id. at 5.)

Taking the facts alleged as true, Neubauer was not in custody at the time she was questioned. Although the interview did not occur in public, it took place in Neubauer's own office. Neubauer was not taken to the office by the agents. She chose to enter the secure area of the building, and the agents followed her. Although the agents closed the doors to her office and the doors locked automatically, Neubauer does not allege that she was unable to open the doors or that the agents barred her from exiting the office. The mere fact that an interview takes place in a secure location does not transform it into a custodial interrogation. *See United States v. Budd*, 549 F.3d 1140, 1145-46 (7th Cir. 2008) (building security in police station did not make interview custodial). Although the agents were armed, there is no allegation that the officers used any force or touched Neubauer. *See United States v. Littledale*, 652 F.3d 698 (7th Cir. 2011) ("[A]lthough the officers carried holstered weapons, neither the officers nor the [ICE] agents physically touched, threatened to touch, or handcuffed [the defendant].") Nor does Neubauer allege that the agents told her she could not leave or that they would not leave unless she answered questions. Finally, although the agents told Neubauer that she was a suspect

and that they would have no problem arresting her, *Miranda* rights are not required simply because the person being questioned is a suspect. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The issue is whether, objectively, Neubauer was free to leave the location of the interview. The court finds that she was free to do so.

Neubauer also claims that her statements were not voluntarily given, because her "will was overborne due to the coercive atmosphere" created by the agents. The Supreme Court has recognized that even noncustodial interrogation can, in "special circumstances," involve behavior by law enforcement that could "overbear [a suspect's] will to resist and bring about confessions not freely self-determined." *Beckwith v. United States*, 425 U.S. 341, 348 (1976) (internal citation omitted). But the facts as alleged by Neubauer involve no special circumstances. She was herself a law enforcement officer and, as such, should have known she was free to terminate the interview. Although the officers informed her of the extent of the investigation, Neubauer has not alleged that they fed her false information or made her false promises of leniency. *See Dillon*, 150 F.3d at 757. This court thus concludes that the interview was free of coercion, and Neubauer's statements were voluntary.

Because the facts as alleged by Neubauer do not support granting the motion in her favor, the court finds no need for an evidentiary hearing on Neubauer's motion to suppress. The motion is denied.

### IV. CONCLUSION

For the foregoing reasons, the defendants' joint motion to dismiss the indictment is denied, as are the motions by Scaccia and Neubauer to suppress statements made to federal agents.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 8, 2012